724 F.Supp. 1384 (1988)
Ralph STELL, by Next Friend, et al., Plaintiffs
United States of America, Plaintiff-Intervenor
v.
The BOARD OF PUBLIC EDUCATION FOR the CITY OF SAVANNAH AND the COUNTY OF CHATHAM, Darnell Brawner, John K. McGinty, et al., Defendants.
Civ. A. No. 1316.
United States District Court, S.D. Georgia, Savannah Division.
June 3, 1988.
*1385 Jonathan Marks, Nathaniel Douglas, Franz R. Marshall, Educational Opportunities Litigation Section, Civ. Rights Div., U.S. Dept. of Justice, Washington, D.C., Hinton R. Pierce, U.S. Atty., S.D. Ga. by Kenneth C. Etheridge, Asst. U.S. Atty., *1386 Robert E. Robinson, Savannah, Ga., Julius Levonne Chambers, Lowell Johnston, Norman J. Chachkin, New York City, for plaintiffs.
Steven E. Scheer, Lee, Smith, Thompson, Black, Scheer & Hart, P.C., Savannah, Ga., Alfred A. Lindseth, Judith A. O'Brien, Sutherland, Asbill & Brennan, Atlanta, Ga., for defendants.

ORDER
EDENFIELD, District Judge.
This Order addresses the measures that defendant Board of Public Education for the City of Savannah and the County of Chatham must adopt and the action it must take to remedy the de jure segregation of its schools.

I. Background

A. History of the Case
Plaintiffs Ralph Stell et al. commenced this suit in 1962 to require defendant Board of Public Education for the City of Savannah and the County of Chatham ("School Board") to desegregate the public schools of Savannah and Chatham County, Georgia.[1] Subsequently, the United States intervened in the litigation. In light of the decisions of the United States Supreme Court and the Circuit Court relating to school desegregation, the School Board moved with minimal intervention by this Court until 1971. In that year the Circuit Court determined that desegregation was not moving with requisite speed, and on June 30, 1971 and August 31, 1971 this Court ordered the School Board to produce a desegregation plan in accordance with federal constitutional standards, submit such a plan to the Court for approval, implement the plan and file semi-annual reports similar to those required in United States v. Hinds County School Bd., 433 F.2d 611 (5th Cir.1970), until a unitary school system was achieved.
The plan suggested by the School Board and approved by the Court in 1971 provided for the pairing and clustering of all-black and all-white schools, for mandatory assignment, and for extensive busing to achieve desegregation. See Defendant's Exhibit 3. The Court notes that at that time the School Board went well beyond the minimum constitutional requirements set forth by the Supreme Court in Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and achieved immediate and striking although very temporary  results.[2] This change, from a dual system premised on the total segregation of the races to a system racially balanced through busing, apparently triggered other changes. Following the institution of the 1971 plan, the school system quickly lost a predominantly white and middle class population of approximately 10,000 children to private and other area schools. During the first year, approximately forty-two percent of all white students assigned to a black receiving school failed to enroll in the school to which they had been assigned mandatorily. This "white flight" continued over the years as the school district, which had been a majority white district prior to the 1971 plan, became predominantly black.
It became increasingly clear that the mandatory plan under which the school system had been operating since 1971 was unsuccessful in eliminating the last vestiges of the prior dual system and in achieving a unitary system in compliance with the mandates of the Court. While the school system has become predominantly black, certain schools within the system are almost exclusively black or exclusively white. *1387 Consequently, by Order entered June 14, 1985, the Court directed the School Board "to proceed with immediate examination of the attendance zones in this school system and submit a redrawn desegregation plan so as to bring an end, once and for all, to the dual system of education that continues in this school system." In response, the School Board submitted a long range plan to desegregate the school system by closing certain schools, building new facilities and converting some existing facilities, implementing magnet schools and programs, redrawing attendance zones, and restructuring grade configurations. The parties negotiated and agreed that the proposed long range plan was consistent with Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c et seq., the Fourteenth Amendment to the United States Constitution, and previous Orders of this Court. The Court approved the plan, and a consent decree was entered January 5, 1987.
The implementation of the long range plan was contingent upon approval by the voters of Chatham County of a bond issue necessary to finance the extensive new construction and renovation as well as other expenditures contemplated by the plan. Unfortunately, the voters rejected the bond issue by a margin of more than two-to-one.[3] After the defeat of the bond issue, the Court directed the School Board to submit a new plan to desegregate the school system in conformity with the mandates of the Court, and made it clear to the parties that it would accept nothing less. The Court also informed the parties that an acceptable plan, one either submitted by the parties or imposed by the Court, would be in effect by the start of the 1988-89 school year. Although the parties attempted to negotiate another agreement, they could not agree on a plan acceptable to all parties. On March 15, 1988, the School Board submitted a revised plan ("School Board's plan"), a less ambitious version of the long range plan which was the subject of the Consent Decree entered January 5, 1987.
Plaintiffs objected to the School Board's plan and submitted an alternative plan of their own ("plaintiffs' plan"), a variation of the School Board's plan. The United States as plaintiff-intervenor ("Justice Department") objected to both plans.[4] On April 25, 1988 this Court commenced a hearing for the purpose of gathering evidence from the parties regarding both the School Board's plan and the plaintiffs' plan as well as an appropriate remedy to desegregate the Savannah-Chatham County school system. At the close of the hearing, the Court allowed the parties additional time to submit supplemental materials and memoranda. The Court has now considered all of the evidence and argument of the parties in support of and in opposition to both submitted plans.

B. The Savannah-Chatham County School District
The Savannah-Chatham County School District covers the 455 square miles of Chatham County and its population of approximately 216,000. Of that population, about 150,000 live within the City of Savannah. There are approximately 30,641 students enrolled in the Savannah-Chatham County School System. Fifty-nine percent of the students are black and forty-one percent are white. In the elementary grades, kindergarten ("K") through fifth grade, there are 16,909 students, and of those, 9,962 are non-white and 6,947 are white. In the middle school grades, sixth through eighth grades, there are 6,852 students enrolled, and of those, 4,071 are nonwhite and 2,781 are white. In high school, *1388 ninth through twelfth grades, there are 6,880 students enrolled, and of those, 3,927 are non-white and 2,953 are white. Within the system, there are presently thirty-three elementary schools, eight middle schools and seven high schools.
At the elementary level, seventy percent of all non-white students and sixty-eight percent of all white students are in schools with a racial composition within twenty percentage points above or below the system-wide student ratio at their grade level. At the middle school level, eighty-six percent of all non-whites are in such schools. At the high school level, one hundred percent of all white students are in racially balanced or predominantly black schools; fifty-one percent of all black students are in racially balanced schools and twenty-four percent are in schools that are within only a very few percentage points of a plus or minus twenty percent racial composition.

C. Overview of the Parties' Proposals

1. The School Board's Plan

The School Board's Plan, described in Defendant's Exhibit 5 and updated and summarized in Defendant's Exhibit 7, abandons the use of pairing and mandatory reassignment, the principal desegregation devices of the 1971 plan. Instead, the Board proposes a plan relying on three essential features: revised attendance zones designed to maximize desegregation through emphasis on a neighborhood school assignment plan; magnet programs at eleven predominantly black inner city schools in order to desegregate those schools; and a majority-to-minority transfer option to desegregate predominantly white schools. The goal of the School Board's plan is to have the percentage of white and black enrollment at each school fall within twenty percentage points of the percentage of white and black students at each grade level in the entire district by the 1991-92 school year.
At the elementary school level, the School Board's plan relies largely on geographic rezoning, magnet programs in eight schools and majority-to-minority transfers. In addition, the School Board would close several schools it has determined are outmoded and would be difficult to desegregate, and the plan contemplates building two new elementary schools in the predominantly black residential areas of downtown Savannah. The high and middle schools, which are not presently paired, would retain the attendance zones now in effect. There are presently no predominantly white high or middle schools. With regard to the predominantly black high and middle schools, magnet programs would be placed at Beach and Savannah High Schools and at Hubert Middle School to attract white students in order to desegregate these three schools. According to the School Board, the other high and middle schools are currently desegregated so that no further action is anticipated with respect to them.[5]
The heart of the School Board's plan lies in magnet programs placed in individual schools. A magnet is an educational program which, in addition to a basic curriculum, offers an additional highly specialized curriculum centered on some theme. Such a program is designed to meet the needs of students in such a way that it will prove attractive enough to draw students from around the school district. These magnet programs would be established in what would otherwise be predominantly black schools based on their proposed attendance zones.[6] The School Board's plan does not include what are known as dedicated magnets, in which entire schools are turned into magnet programs. Rather, the School Board's plan calls for magnet programs to be housed in schools along with *1389 regular educational programs, with each magnet program to enroll fifty percent white and fifty percent black students. At the same time, the non-magnet programs in these schools would be made up predominantly of black students.[7]
Another essential facet of the School Board's plan is the majority-to-minority ("M to M") transfer program, which would allow a student in the majority race in his or her school to transfer to a school in which he or she would be in the minority. Free transportation would be provided. This program would be entirely voluntary, like the magnet programs, and by its nature the program is intended to have a desegregative effect. The School Board predicts that black students would be most likely to take advantage of this M to M option; the School Board does not anticipate that a significant number of white students would transfer under this program although they would be free to do so. The School Board plans to promote the M to M and magnet programs through advertising and informational campaigns.
Under the School Board's plan, by 1992 two new schools would be constructed and operational and eight schools would be closed. Barnard, Port Wentworth and Tybee elementary schools will be closed in 1988-89; Herty, Pennsylvania Avenue and Riley elementary schools will be closed in 1990-91; and Pearl Smith and Thirty-Eighth Street elementary schools will be closed in 1991-92. According to the Board, these schools are all outmoded or impractical for use in the desegregation plan because of small capacity, location or size limitations which prevent expansion or the use of portable classrooms.[8] Two new elementary schools, now designated Downtown East and Downtown West, would be built in predominantly black residential areas of downtown Savannah. Downtown East is scheduled to open in time for the 1990-91 school year, while Downtown West is scheduled to open for the 1991-92 school year. In addition, substantial renovations would be made at other predominantly black schools in which the School Board proposes to house magnet programs.

2. Plaintiff's Plan

Plaintiffs have submitted an alternative plan, based in large measure on the School Board's plan and enrollment projections, and their plan is set forth in Plaintiffs' Exhibit 5. Plaintiffs' plan relies on the same attendance zones as the School Board's plan and contemplates the same school closings and the same new construction and renovations. Plaintiffs' plan also would allow for the voluntary M to M transfer program proposed by the School Board.
Instead of magnet programs within otherwise non-magnet schools, plaintiffs' plan would require that each magnet school be a dedicated magnet, so that the entire school would be dedicated to magnet usage and that no non-magnet program would exist in that school aside from the pre-first grade programs. Plaintiffs' plan would require these dedicated magnets to enroll sixty percent black and forty percent white students, as opposed to the fifty-fifty ratio in magnet programs proposed by the School Board. Dedicated magnets with such an enrollment ratio would result in resident black students being mandatorily reassigned in order to allow white students to transfer voluntarily to magnet schools, and so, to minimize this inequity, plaintiffs' plan would reserve sixty percent of all magnet seats for both black and white students who reside in the area of the magnet school (the "shadow-zone"). To ensure that other schools do not become segregated during the process of desegregating magnet schools, plaintiffs' plan would require *1390 that the racial proportion of students permitted to transfer out of any non-magnet school approximate the racial proportion of the students assigned to that magnet school.
Plaintiffs' plan would further require that one middle school be dedicated as the site of follow-up programs for all elementary magnet programs except the Montessori and extended day programs. Plaintiffs recommend but apparently would not require high school follow-up programs.
Plaintiffs' plan would include a mandatory back-up plan in the event that the magnet and M to M programs prove ineffective. This back-up plan would come into effect if, after a serious three year attempt, a magnet school fails to reach seventy-five percent of the projected enrollment of both black and white students. The magnet would then be discontinued and the former magnet school paired with another school.[9]
Plaintiffs also propose a number of so-called improvements in the School Board's plan, including specific suggestions for the Montessori magnet, staffing suggestions for the magnets, and suggestions for effective enrollment procedures. Plaintiffs and the Justice Department also criticize the School Board's plan for its total reliance on voluntary desegregation techniques, for its reliance on magnet programs within otherwise non-magnet schools, and for what they see as inadequacies in the data and projections relating to enrollment.

3. The Justice Department's Position

While critical of the School Board's plan for many of the same reasons listed by plaintiffs, the Justice Department also criticizes plaintiffs' plan because it would mandatorily reassign many black students to predominantly white schools without a commensurate burden being placed on white students. At closing arguments at the April 25-27 hearings, an attorney for the Justice Department mentioned an alternative proposal which would preserve the voluntary approach of the School Board's plan while making the two newly constructed elementary schools, Downtown East and West, dedicated magnets and requiring some sort of mandatory back-up plan if magnet programs fail to desegregate after two years.[10]

II. The April 25-27 Proceedings

A. Defendant School Board's Presentation
At the April 25-27 hearing, the School Board called a number of credible witnesses who testified in support of its plan. Dr. Cecil Carter, Superintendent of the School System, testified at some length about the design, goals and feasibility of the School Board's plan. Dr. Carter directed the School Board staff in developing its plan, and explained that the plan was developed amidst a climate of educational reform in the mid-1980s. Therefore, the School Board's plan was intended to improve the quality of educational services as well as to desegregate the school system. Dr. Carter made a point of informing the Court that his first priority was the educational soundness of the school system. Therefore, any feature that the School Board deemed educationally unsound was not included in the desegregation plan.[11]
Dr. Carter addressed each of the important features of the School Board's plan. He explained that the School Board first tried to accomplish as much desegregation as possible by redrawing the district's attendance zones. After refashioning the zones, however, the School Board still could not desegregate all the schools. After an extensive survey on attitudes toward voluntary and mandatory desegregative techniques and consultation with several experts, the School Board decided to rely primarily on the two voluntary techniques of M to M transfers and magnet programs.
*1391 Dr. Carter explained that the School Board's policy would allow a transfer under the M to M program only if it would have the effect of bringing both the sending and receiving schools closer to compliance with the desegregation order of the Court. He testified that the School Board had accomplished little through M to M transfers this past year because the School Board had not adequately promoted these transfers through advertising and other public relations techniques.[12] Dr. Carter emphasized that he and the School Board were committed to promoting these M to M transfers adequately in the future, since marketing was essential for meeting projected M to M transfers which are in turn crucial to the success of the School Board's plan.
Dr. Carter testified that the use of dedicated magnet schools was rejected in favor of magnet programs within schools because dedicated magnets would displace too many students residing in the areas of predominantly black schools and would place a disproportionate and unfair burden of mandatory busing on black children. He further testified that the first two magnet programs contemplated by the School Board's plan, a performing and fine arts magnet program at Gadsden Elementary School and a computer science magnet program at Hodge Elementary School, were instituted this past school year and have been highly successful. Dr. Carter explained the importance of involving parents in the education of their children, and indicated that the two magnet programs had achieved a dramatic increase in parental involvement. In addition, the magnet programs had been successful in attracting white students to predominantly black schools.
The School Board has adopted a grade structure whereby elementary schools will contain grades K through five, middle schools grades six through eight, and high schools grades nine through twelve. The School Board's desegregation plan would coincide with the phase-in of this structure.
Dr. Carter emphasized that this grade structure was designed to provide the most appropriate and educationally sound academic and administrative framework.
In the opinion of Dr. Carter, a departmentalized system for teaching young children, where students move from teacher to teacher for different courses, is not educationally sound at the elementary level. Therefore, it is the School Board's policy to maintain self-contained classrooms in elementary schools  for both the magnet and non-magnet programs.
The School Board also conducted an extensive system-wide evaluation of its facilities. Dr. Carter explained that certain schools had been identified as unable to accommodate both the goals of educational improvement and the goals of desegregation. These schools would be scheduled to close under the School Board's plan. New school construction and renovations scheduled under the plan have been designed to conform with the goals of the desegregation plan.
Dr. Carter expressed his confidence that the School Board would be committed to implementing its plan and that the plan would be effective in desegregating the Savannah-Chatham County School System. On cross-examination, the Justice Department established that if the private school returns and magnet and M to M transfers in individual schools fall even slightly short of the School Board's projections, those schools would be out of compliance with the plus or minus twenty percent enrollment structure of the plan. Dr. Carter admitted that the science of projecting school enrollments is not an easy one, and stressed that the Board's projections are based largely on survey results but that the Board has great confidence in the general accuracy and validity of its projections.
In her testimony, Dr. Martha Fay, President of the Savannah-Chatham County Board of Education, corroborated much of the testimony of Dr. Carter. Dr. Fay testified *1392 that the Board decided to abandon a paired school and mandatory busing approach to desegregation because it was educationally unsound and had resulted in the resegregation of the school system. In addition, she stressed that the School Board refused to place the burden of busing substantially on one race or another. Dr. Fay reiterated that the School Board members have great confidence in the enrollment projections for their plan and in the prospects for success of the program.
When questioned about the School Board's efforts to promote the voluntary magnet and M to M programs for the past school year, Dr. Fay explained that the School Board had concentrated on promoting the two new magnet programs and had neglected to target the M to M transfer program except for a "dull little booklet." Thus, the M to M program was not as successful as the two magnet programs; however, Dr. Fay assured the Court that the School Board intended to promote vigorously the M to M program. While acknowledging that the School Board has no concrete back-up plan in the event that the School Board's projections are not met, Dr. Fay admitted that, should any part of its plan fail, the School Board would need to do "something different" to achieve racial equality. She reiterated that the School Board was committed to meeting the goal of desegregation in the public schools, and she testified that, although funding was difficult, the School Board would have sufficient finances to support the proposed plan. Jerry Ford, an investment banker and the School Board's consultant on financing, testified that the School Board would be able to finance the proposed plan, even though the funding would be "very tight."
Margaret Johnson, Principal at Gadsden Elementary School, and Ethel Bryant Gibbs, Principal at Hodge Elementary School, each testified as to the apparent initial success of the magnet programs in their respective schools. In each of these schools the magnet and non-magnet students are enrolled in the same basic curriculum; the difference is that the magnet program emphasizes the additional magnet core component. Magnet program students are in separate classes from non-magnet students in all academic subjects. Non-magnet and magnet students participate together in assemblies, lunch hour, band, chorus, playground and physical education. The principals stressed the positive climate they perceived the magnet programs had fostered in these schools: there was no discernable friction between magnet and non-magnet students; student discipline had improved markedly from past years; students seemed more enthusiastic and more motivated generally; there had been no parent complaints regarding the new structure; and parents seemed more involved as a result of the magnet programs. Each principal emphasized that the magnet facilities and programs also benefitted non-magnet students, who were able to take advantage of the magnet offerings although to a lesser extent than the magnet students. The testimony also indicated that there was interaction among the magnet and non-magnet students.
The School Board called several impressive witnesses to testify specifically about the School Board's enrollment and transfer projections, the 1986 parent survey upon which the Board based its projections, and the likelihood that the Board can achieve these projections and effectively desegregate the schools using voluntary desegregation techniques. Sandra Berry, a survey researcher and sociologist affiliated with the Rand Corporation, was accepted by the Court as an expert in conducting surveys. She explained that she had been retained by the School Board to assist in conducting the 1986 parent survey. She testified as to the reliability of conducting surveys over the telephone, as to the care taken in the design and testing of the survey, and as to the techniques employed in conducting the survey. Berry testified that the survey used accepted techniques and met acceptable standards so that its results would be reliable. See Defendant's Exhibits 47 and 51.
Defendant called two witnesses the Court accepted as experts in school desegregation. *1393 The first, Dr. David J. Armor,[13] presently Principal Deputy Assistant Secretary of Defense, testified at length as to the validity of the 1986 survey, the reliability of the Board's enrollment and transfer projections, and the prospects for the success of the School Board's plan. Dr. Armor has special expertise in the area of mandatory busing and its effect on white flight.[14] He testified that the 1970-71 pairing, mandatory reassignment and busing plan was originally successful in achieving racial balance in the schools for a year or two, but that eventually that plan failed due to a rapid and drastic white enrollment loss which has continued to worsen over the years. See Defendant's Exhibits 21, 22, 23, 24 & 31. Dr. Armor opined that the drop and decline in the number of white students in the Savannah-Chatham County school system was the result of mandatory pairing and busing, and that this white flight following the imposition of mandatory busing in Savannah-Chatham County was similar to the experience documented in other cities across the country following the imposition of mandatory busing. See Defendant's Exhibit 41. Dr. Armor explained that it was difficult to maintain stable white enrollment in a school that is predominantly black, and reasoned that "one cannot have meaningful desegregation without white students."
Because of the devastating affect of mandatory busing on the school system in the past, Dr. Armor recommended that the School Board institute a fully voluntary plan utilizing voluntary techniques that have proven successful in other cities across the country. Such a plan would: 1) rely as much as possible on rezoning; 2) eliminate mandatory busing; 3) use an M to M transfer program to integrate white schools; 4) use magnets to integrate black schools. The School Board's plan embodies Dr. Armor's recommendations. Based on the results of the 1986 survey, other data pertaining to the district, the results of the first year of the magnet programs, and the success of similar voluntary plans instituted in other cities, Dr. Armor predicted that the School Board's plan would be successful in achieving both long-term and stable desegregation in Savannah-Chatham County schools.[15] Finally, Dr. Armor predicted that the School Board's plan would achieve desegregation and increase the quality of education in the public schools.
The Court heard further support for the School Board's plan from Dr. Christine H. Rossell, Associate Professor of Political Science at Boston University, a specialist in school desegregation and consultant to the School Board on desegregation.[16] Dr. Rossell provided the most comprehensive explanation of the way the results of the 1986 survey were transformed into the projections *1394 for M to M transfers, private school returns and magnet transfers. Dr. Rossell arranged for the involvement of Survey Specialist Sandra Berry, with whom Dr. Armor and Dr. Rossell designed the survey. Amrigon Enterprises, Inc., a Michigan-based survey research firm, carried out the survey telephone interviews. See Defendant's Exhibit 51, Report on the Savannah-Chatham School District Survey of Public and Private School Parents. Dr. Rossell then formulated the projections for M to M transfers, magnet transfers and private school returns in relation to the School Board's long range plan approved by the Court and agreed to by the parties in the Consent Decree entered January 5, 1987. After the defeat of the bond issue, Dr. Rossell was asked to assist the School Board in revising the long range plan, redrawing attendance zones, and developing the magnet program proposals.
Dr. Rossell based her projections for anticipated M to M transfers, magnet transfers and private school returns in large measure on the results of the 1986 survey. She emphasized that her projections were very conservative because she basically estimated a transfer percentage based almost exclusively on a percentage of those who responded that they would definitely transfer under a voluntary plan, without relying on those who indicated that they would probably transfer. As to the reliability of the survey, Dr. Rossell referred to the predictive accuracy of similar surveys used in other cities. While not comparing the particular situations and problems in other cities with those of Savannah, Dr. Rossell indicated that the survey she relied on here has proven accurate in predicting transfers elsewhere  in particular in Yonkers where her projections proved extremely accurate. See Defendant's Exhibit 45. Dr. Rossell's projections, set forth in Defendant's Exhibit 27, were based on the survey results, on her extensive research and experience in other school districts, and on her consultations with the school district staff. While staking her reputation on the accuracy of her district-wide projections, she admitted that she was less confident of her projections for individual schools, and noted that the success of these transfers occurring at individual schools is "dependent upon the school district making this happen, on targeting these schools," and on successful public relations.
Dr. Rossell also testified that voluntary techniques such as the M to M transfers and magnet programs have been very successful in desegregating schools in other cities. As to her recommendation that the School Board implement and rely on a fully voluntary plan for desegregation, Dr. Rossell discussed several ways in which a voluntary plan was more effective than a mandatory plan. She had concluded in the 1970s that mandatory plans were more effective than voluntary plans, and she explained that if one looks only at the first year results of a plan, that may still be true; however, Dr. Rossell testified that if one considers the first four or more years of a plan, it becomes apparent that voluntary plans take longer to achieve their goals but that they effectively desegregate and that they produce and maintain greater interracial exposure, so that voluntary plans are more effective in the long run. She testified that voluntary plans do not produce or contribute significantly to white flight, while mandatory plans produce continued white flight. Voluntary plans allow for choice, for greater parental involvement, and for educational enhancement due to the added resources of the magnet programs.[17]
*1395 Dr. Rossell characterized the experience of non-magnet students in magnet schools as "part-time desegregation." She explained that she had recommended the use of magnet programs rather than dedicated magnets, in spite of the part-time desegregation experience of non-magnet students in these schools, because dedicated magnets necessitate mandatory reassignment of resident black students who do not enroll in the magnet programs and place on those students an unfair busing burden. Therefore, the balance seemed weighed in favor of magnet programs rather than dedicated magnets. Dr. Rossell recommended a fifty percent ratio of black to white students in the magnet programs because the 1986 survey indicated that such a ratio would be most effective in attracting students to transfer to the magnet program.
Dr. Rossell testified that a mandatory back-up plan was not included in her recommendations to the School Board for several reasons. Such a plan may send a negative signal to parents otherwise willing to participate in magnet programs; other parents may be unwilling to move their children from private schools when faced with threats of mandatory busing. Furthermore, failure of particular schools to meet enrollment projections should be dealt with on a flexible, school-by-school basis, and not necessarily through a mandatory back-up plan. She explained that adjusting magnet programs already in place or placing additional magnet programs in schools without magnets may be more appropriate solutions than the automatic, mandatory reassigning and busing of students in certain schools if those schools fail to meet their goals within two or three years. To fashion a mandatory back-up plan now without taking into account the particular problems which may exist in certain schools several years from now would be inappropriate. Dr. Rossell also recommended that the School Board "try to avoid *1396 mandatory reassignments if at all possible."
In summary, Dr. Rossell testified that, based on her understanding of the district, the results of the 1986 survey and her research and experience in desegregation in numerous other cities, she was confident that the School Board's plan would effectively desegregate the Savannah-Chatham County schools by 1992.

B. Plaintiff's Presentation
Plaintiffs presented their proposed alternative plan for desegregating the Savannah-Chatham County public schools. Dr. Michael J. Stolee, Professor at the University of Wisconsin, Milwaukee, prepared the plan submitted by plaintiffs and was accepted by the Court as an expert in school desegregation.[18] Dr. Stolee began his criticism of the School Board's plan by attacking the overall validity of the 1986 survey on which Dr. Rossell had based her projections. He admitted that he had no expertise in surveys, but that he had serious doubts that they could be relied on in predicting much of anything, particularly enrollment figures for voluntary programs such as those included in the School Board's plan. Dr. Stolee attacked the validity of the survey because it contained what he thought were flaws. For example, the survey revealed that of those questioned, ten percent would definitely and twenty percent would probably leave the area or not place their children in the school system, yet these responses were not excluded from the final survey results and, therefore, the results must be invalid. On rebuttal, Dr. Rossell explained that the survey was conducted of a random sample, representative of the population and that the population should remain consistent over time. Dr. Rossell also corrected certain minor errors which Dr. Stolee pointed out. Dr. Stolee insisted that the School Board's plan was based on bad data and faulty assumptions. Despite this, Dr. Stolee explained that he would like to see the School Board have the opportunity to try a magnet school plan because it showed promise for improvement in educational opportunities. Dr. Stolee's alternative plan is essentially a revision of the School Board's plan, one which Dr. Stolee considers an improvement.
Because non-magnet classes in schools housing magnet programs would be segregated, Dr. Stolee recommended that the magnets all be dedicated magnets.[19] In addition, Dr. Stolee recommended that the racial proportion of the magnets be sixty percent black and forty percent white, so that the school-wide racial proportion would be reflected in the racial composition of the magnets. He opined that such a ratio would be more equitable to black students who would have a greater opportunity for admission to a magnet program under the plaintiffs' plan. Dr. Stolee did not address entirely the issue of the burden of mandatorily reassigning resident black students who do not enroll in the magnet, although he recommended that sixty percent of all places in the magnet programs be reserved for resident students to alleviate some of the inequity caused by mandatory reassignment.[20]
*1397 Dr. Stolee also pointed to a number of what the Court would view as either administrative or secondary problems not adequately addressed by the School Board's plan. For example, he pointed to particular problems with the Montessori magnet program, pointed to the need for special training or support for magnet teachers and principals, and recommended special enrollment procedures be adopted. Dr. Stolee also noted that the School Board's elementary magnets were not followed up by magnet programs in the middle or high schools, and recommended that one middle school be set aside to house magnets programs which would follow-up on the elementary magnets.[21]
While attacking the validity of the survey data and assumptions on which the School Board's plan relies, Dr. Stolee's plan for the plaintiffs relies on the same data and assumptions, but changes the structure of the magnet schools. Dr. Stolee said he had done no cost analysis although he admitted dedicated magnets are probably more expensive. While stating that, based on the available data, the Court could have no assurance that either the School Board's or the plaintiff's plan would work, Dr. Stolee then assured the Court that his proposed plan would serve to desegregate the public schools.[22] Furthermore, Dr. Stolee testified that, although he has appeared as an expert and written reports in a number of desegregation cases, he is not an expert in statistical analysis or surveys, he has never done any research or scholarly writing in the areas of white flight, mandatory versus voluntary plans, M to M transfers, or the characteristics of effective school desegregation plans. He testified that he has consulted with one parent from the school system, but has consulted no school board members, no teachers, and no administrators; nor has he visited either Gadsden or Hodge Schools or inquired as to the success of the first two magnet programs.

C. The Justice Department's Presentation
While critical of the School Board's and plaintiffs' plans, the Justice Department called no witnesses and presented no evidence either in support of its proposal or in opposition to the other plans.

III. Legal Requirements

In 1954, the United States Supreme Court held that segregation of children in public schools on the basis of race, "even though physical and other tangible facilities are equal," deprives minority children of equal educational opportunity. Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In the context of the segregated school systems in the South, the Brown decision and the Fourteenth *1398 Amendment to the United States Constitution required a dismantling of dual school systems and a transition to racially non-discriminatory unitary school systems. See, e.g., Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). In Green v. School Bd. of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Supreme Court instructed that school districts "operating state-compelled dual systems were ... clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Id. at 437-38, 88 S.Ct. at 1693-94. Where the Supreme Court had once held that a school district must act with all deliberate speed, Green expressly rejected that doctrine and stressed that the "burden on a school board today is to come forward with a plan that promises realistically to work and promises realistically to work now." Id. at 439, 88 S.Ct. at 1694 (emphasis in original).
It was in the wake of the decisions in Green and Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), that Judge Lawrence of this Court ordered the sweeping and comprehensive pairing, mandatory reassignment and busing plan suggested by the School Board which had the immediate and short-lived impact of racially balancing the public schools in the early 1970s. In Swann, the Supreme Court directed the district court to provide specific types of remedies, including school transportation, for school desegregation plaintiffs. While forcing school districts to act forthwith through whatever means appropriate to achieve immediate results, the Supreme Court recognized as early as Green that voluntary techniques may serve as effective devices where they offer a real promise of aiding a desegregation program. Green, 391 U.S. at 440-41, 88 S.Ct. at 1695-96. Swann expressly recognized majority-to-minority transfer programs as a "useful part" of desegregation plans and an "indispensable remedy" for certain students within a school district. Swann, 402 U.S. at 26, 91 S.Ct. at 1281. Dr. Armor and Dr. Rossell testified as to the effects of mandatory reassignment on school districts generally and on this school district specifically: pairing, mandatory reassignment and busing have resulted in significant white flight and in the resegregation of the public schools.
Through no apparent fault of the School Board, the sweeping remedy ordered in the early 1970s has not proved effective over the long run, and plaintiffs' frustration was apparent to the Court at the recent proceedings. As one commentator has lamented:
The length and intensity of the struggle to desegregate public education in America has frustrated many people in black and white communities across the country. Many are confused about what the Brown decision represented. They claim that desegregation has not resulted in increased academic performance as measured, for instance, by test scores on standardized examinations, and that, therefore, the effort has been futile. While there is evidence to the contrary, i.e., that desegregation has produced improved performance on standardized examinations, the constitutional mandate to dismantle dual systems does not turn upon the fluctuation of test scores. Still others point to the stubborn persistence of segregated public schools as evidence of the futility of the endeavor. Faced with a problem which appears to be intractable, some have given up.
Branton, The History and Future of School Desegregation, 109 F.R.D. 241, 244 (1986). There has never been a finding of a unitary school system in this case, and this Court has retained jurisdiction to insure that the School Board fulfills its constitutionally imposed duty to eliminate the last vestiges of the dual system, and that the School Board provides the students of Savannah-Chatham County public schools with a desegregated education forthwith.
The role of this Court is to fashion a remedy that assures that the School Board completes the transition to a unitary system. This remedial enterprise is wholly equitable in nature. Brown v. Board of Educ. (Brown II), 349 U.S. 294, 75 S.Ct. *1399 753, 99 L.Ed. 1083 (1955). See also Swann, 402 U.S. at 15, 91 S.Ct. at 1275 ("Once a right and a violation have been shown, the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."). The Court must consider several factors in its exercise of this equitable power. The Supreme Court has instructed that, in a desegregation case, "[a]s with any equity case, the nature of the violation determines the scope of the remedy." Swann, 402 U.S. at 16, 91 S.Ct. at 1276. Therefore, the scope of the desegregation remedy should be determined according to the nature of the constitutional violation. Also, the plan which this Court orders must be remedial in nature; it must be designed to restore the victims of discrimination to the position they would have occupied in the absence of unconstitutional conduct on the part of the School Board. Milliken v. Bradley, 433 U.S. 267, 280-81, 97 S.Ct. 2749, 2757-58, 53 L.Ed.2d 745 (1977). Moreover, the remedy should take into account the interests of local authorities in managing their own affairs, so long as this action is consistent with the Constitution. Id. (emphasis added). In summary, the Court's task "is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution." Swann, 402 U.S. at 16, 91 S.Ct. at 1276.
The measure of a desegregation plan is its effectiveness. Davis v. Board of School Comm'rs, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). The Court is obligated to "assess the effectiveness of a proposed plan in achieving desegregation." Green, 391 U.S. at 439, 88 S.Ct. at 1695. However, an effective plan need not necessarily be inconsistent with one that balances various interests affected by the plan, and there is no universally appropriate method for school desegregation; "there is obviously no one plan that will do the job in every case." Id. The type of plan employed is of little consequence so long as it effectively achieves the constitutionally required result that public schools be conducted on a unitary basis. Valley v. Rapides Parish School Bd., 434 F.2d 144, 146 (5th Cir.1970). In overseeing the elimination of all vestiges of unlawful segregation in a public school system, enormous discretion is vested in the district court to structure an appropriate remedy. Swann, 402 U.S. at 15, 91 S.Ct. at 1275. Lee v. Anniston City School Sys., 737 F.2d 952, 955 (11th Cir.1984).
In devising a remedy, however, this Court is required to respect the interests of school officials in managing their own affairs, so long as their proposed actions are consistent with the Constitution. Milliken v. Bradley, 433 U.S. 267, 280-81, 97 S.Ct. 2749, 2757-58, 53 L.Ed.2d 745 (1977). The remedy must effectively "desegregate an educational system in which the races have been kept apart, without, at the same time, losing sight of the central educational function of the schools." Id. at 280 n. 15, 97 S.Ct. at 2757 n. 15. The burden of proposing an effective desegregation plan properly falls upon the defendant school district following a finding of unlawful segregation. Deference to local school officials imposes a basic limitation on the scope of the judicial function; however, as the Supreme Court indicates in both Swann and Green, the School Board's opportunity to come forward with an effective plan by no means assures its adoption by the Court as an appropriate remedy. Green, 391 U.S. at 439, 88 S.Ct. at 1694; Swann, 402 U.S. at 17, 91 S.Ct. at 1276.

IV.
The Court has painstakingly considered the record in this case, the testimony of each witness, and the many exhibits submitted by the parties. The Court is persuaded that the plan proposed by the School Board, relying on voluntary desegregation techniques, is particularly appropriate in light of the previous failure of mandatory pairing and busing. Furthermore, the Court is persuaded that, while perhaps not the most desirable plan that could have been selected if financial limitations were not a consideration, the School Board's proposed plan should be effective *1400 in achieving the desegregation of the Savannah-Chatham County public schools.[23]
The Court has considered the nature of the constitutional violation in this case. Contrary to defendant School Board's contention that the problems now faced by the Savannah-Chatham County public schools are not the result or vestiges of the former dual school system, there is no question of liability in this case and, as the Court has noted, there has never been a finding that the school system has achieved unitary status. However, the Court must take into account the condition of the public schools today. The Court cannot ignore that the condition of the schools has changed dramatically since the 1960s. The condition of the public schools bears directly on the nature of the constitutional violation, which in turn determines the scope of the desegregation remedy. What may have appeared to be the only appropriate remedy in 1970 may well be inappropriate and ineffective as a remedy almost two decades later.
The School Board suggested and faithfully implemented the sweeping, comprehensive pairing and busing plan under which the public school operated for many years. The failure of that plan to achieve and maintain a desegregated school system was not due to any reluctance or failure of the School Board to implement the plan. The School Board's long range plan, dependent upon the bond issue rejected by the voters, was an ambitious program which surpassed minimum constitutional requirements. In deferring to the School Board in any respect, the Court is mindful that, unlike many other school desegregation cases, the School Board's track record indicates limited success achieved through reasonable, diligent efforts. The Court is persuaded that the School Board will implement its proposed plan in good faith.[24]
The School Board achieved some results through the 1970-71 plan, and the fact that the middle and high schools are largely in compliance with the Constitution and that some progress is apparent in the elementary schools must figure into the equation by which the Court determines an appropriate remedy in 1988. While clearly the simplest and cheapest technique available, pairing and busing has failed and in fact may be the root of significant damage to the public schools. This Court refuses to rely on a desegregation technique that will serve to destroy the very school system it is intended to save. It is important to note that none of the parties has advocated that the Court order the implementation of such a plan. The Court has ruled out such a plan at this time, and has been persuaded that development of and reliance on more creative and educationally enhancing techniques is overdue. The public schools deserve better; the Constitution requires more.
The School Board established that there is an essential link between the quality of education provided by the schools and the extent of desegregation ultimately to be accomplished in the school system. The Court is persuaded that the School Board's plan is appropriate considering the desegregation task which remains to be completed. The Court is convinced that, generally, the School Board can meet the transfer and enrollment projections set forth in the plan, provided that the plan is implemented and marketed properly. By meeting those projections, the School Board should bring the public schools into compliance with the Constitution.

A. The Voluntary Nature of the Plan
The parties have quibbled over whether any other desegregation plan in the country relies totally on voluntary techniques. *1401 Plaintiffs and the Justice Department argue that because no other school district in the country has relied exclusively on voluntary desegregation techniques, it is inappropriate, impermissible or unconstitutional for the School Board to implement a plan with no mandatory components. Plaintiffs and the Justice Department point to the many cases in which voluntary techniques were used in conjunction with mandatory techniques, and argue that these cases compel or at least should move the Court to require the School Board to rely on the stick as well as the carrot. For example, they point to Davis v. East Baton Rouge Parish School Bd., 514 F.Supp. 869 (M.D.La.1981). In that case the Court rejected a wholly voluntary plan because it would have left over half the students in one-race schools with no prospects for improving that situation. Aside from the fact that the School Board has already relied on mandatory techniques for over a dozen years, the law does not require that a desegregation plan be mandatory in any way, only that it be effective. Davis v. Board of Comm'rs, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). See also Calhoun v. Cook, 522 F.2d 717, on reh'g, 525 F.2d 1203 (5th Cir.1975) (Atlanta school desegregation plan approved over objection that it should have required noncontinguous pairing and busing).
The issue is not whether other techniques might be more effective (although the disastrous effects of mandatory reassignment should be apparent to all); rather, the proper inquiry is whether the techniques included in the plan will be effective in desegregating the schools. The Supreme Court acknowledged the effectiveness and importance of M to M transfers as a desegregation tool in Swann, 402 U.S. at 26, 91 S.Ct. at 1281. Moreover, "the utility and propriety of magnets as a desegregation remedy is beyond dispute." Liddell v. State of Missouri, 731 F.2d 1294, 1310 (8th Cir.), cert. denied, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984). The School Board established, and no one was able to refute, that the proposed plan has every prospect of effectively desegregating the public schools.
Beyond that, the fact that a plan is innovative and a departure from past failed attempts to desegregate the schools does not automatically signify that it is incomplete or lacks merit. On the contrary, the Court views such innovation as a sign that the plan might take into consideration the unique situation of the Savannah-Chatham County public schools.

B. Definition of a Desegregated School
The goal of the School Board's plan is to achieve the maximum practicable degree of actual desegregation in the public schools of Savannah and Chatham County. For the purposes of the School Board's plan, a desegregated school is one which has a racial composition within twenty percentage points above or below the system-wide student ratio at the grade level served by that school. This Court adopts that definition of a desegregated school after consideration of the proposals submitted by the parties and examination of the definitions adopted by other courts.
In other desegregation cases, courts have used a wide range of percentage bands to define appropriate and necessary enrollment levels at desegregated schools. See, e.g., Diaz v. San Jose Unified School Dist., 633 F.Supp. 808 (N.D.Cal.1985) (plus or minus twenty percentage points); Vaughns v. Board of Educ. of Prince George's County, 574 F.Supp. 1280 (D.Md. 1983) (originally 10-50% black revised to 80% black); Arthur v. Nyquist, 566 F.Supp. 511 (W.D.N.Y.1983) (30-65% minority); Armstrong v. Board of School Directors of Milwaukee, 471 F.Supp. 800 (E.D.Wis.1979) (20-60% black). The plus or minus twenty percentage point range adopted by this Court is within constitutional limits.

C. Part-time Desegregation
Plaintiffs and the Justice Department urge the Court to reject the School Board's proposed use of magnet programs within otherwise non-magnet schools, because, as a result of self-contained classrooms, the non-magnet students enrolled in *1402 those schools will receive a limited or part-time desegregated educational experience. Plaintiffs and the Justice Department argue that such an arrangement does not provide for an adequate degree of integration for non-magnet students.
The testimony of the two magnet school principals established that magnet and non-magnet students participated together in numerous assemblies, lunch hours, remedial reading classes, band, chorus, playground and physical education, and that there was interaction among the magnet and non-magnet students. Neither plaintiffs nor the Justice Department presented any evidence as to the claimed inadequacies of the desegregation experience of non-magnet students at Gadsden or Hodge. As these magnet programs are already in operation, the Court relies on the fact that desegregation has occurred to a significant, if limited, extent for the non-magnet students in those two schools and concludes that a similar experience is likely to occur at the schools where magnet programs will be instituted in the next several years.
While conceding that under certain circumstances dedicated magnets would be preferable to magnet programs, the School Board maintains that several legitimate concerns necessitated reliance on magnet program design. If the magnets were dedicated, then resident black children not interested in or unable to enroll in the magnet would be reassigned to schools outside their neighborhoods  most likely to suburban, predominately white schools long distances from their neighborhood schools. The School Board refused to place such an unfair burden on black students, and opted instead for magnet programs within otherwise non-magnet schools as a more equitable arrangement.
The School Board also established that, if the magnet students were placed in decentralized classrooms with non-magnet students for all non-magnet classes, this would serve to attract many fewer students  particularly many fewer white students  to these magnet programs. Moreover, the School Board established the superiority of self-contained classrooms over decentralized classrooms as an educational tool. Centralized classrooms therefore serve to improve the quality of education for all students and also serve to desegregate more effectively by further attracting white students to these predominately black schools.[25]
Although the racial composition of the magnet school classrooms differs from what would be expected through a random distribution within the entire school, the School Board established the educational necessity for such grouping as well as the significant desegregative effect on the entire school resulting from the magnet program design. Such grouping is not unconstitutional per se and does not preclude approval of the School Board's plan. See generally Georgia State Conference of Branches of NAACP v. State of Georgia, 775 F.2d 1403 (11th Cir.1985).
The School Board recognized the possibility of restructuring the magnet programs in order to allow more extensive interaction between magnet and non-magnet students in the future. Because the Court retains jurisdiction over this case, such alterations can be made in the future if necessary. The Court need not order such a revision in the plan at this time because the desegregative necessity of such a change is not apparent, and, on the basis of the record, the magnet program arrangement need not preclude approval of the School Board's plan. The primary purpose of the magnet program as designed for this desegregation plan is to draw white students to the almost exclusively black inner city schools in substantial enough numbers to desegregate those schools. The Court concludes that the magnet programs are designed to achieve the maximum desegregation practicable in the magnet schools at this time.

D. Follow-up Magnets
Some of the elementary level magnet programs in the School Board's plan *1403 are not scheduled to be available to students as they continue in the middle and high schools. Plaintiffs contend that the success of the magnet programs as a desegregative tool depends in part on the continuity of magnet offerings beyond the elementary level, and they argue that one middle school and some high school facilities should be designated to house follow-up magnet programs and that racial proportions should somehow be factored into these decisions. Unfortunately, plaintiffs did not put forth sufficient evidence for the Court to determine whether the lack of follow-up programs could jeopardize the success of magnet programs as a desegregation tool.
The Court recognizes the basic logic of the plaintiffs' position but also understands that follow-up programs may in fact be unnecessary to desegregate the elementary schools and may serve only as an alternative means to desegregate the middle and high schools. The School Board shall address this issue in its October 1, 1988 report to the Court. As the Court retains jurisdiction over this case, it may address this issue in the future should the need arise.

E. Montessori Magnet Design
Plaintiffs object to the School Board's present design for the Montessori magnet and argue that it is deficient or incomplete in the following areas: the age requirement for beginning students, the required credentials for Montessori teachers, the necessity of phasing-in the program, and the lack of special teaching materials. Plaintiffs' concerns deserve the attention of the School Board, and the School Board shall report in detail to the Court and to the other parties as to the design of the Montessori magnet program by August 1, 1988. The Court assumes that the Board shall remedy any inadequacies in its Montessori magnet program.

F. Magnet Staff Training and Additional Assistant Principals
Plaintiffs argue that because of the special nature of magnet programs, staff members and principals at magnet schools must be provided special training in the magnet area, and magnet principals require the support of additional assistant principals.
Based on the testimony of the two magnet principals, the Court finds no basis to treat as fact plaintiffs' fear that the magnet principals may not be up to their task. The Court also doubts that plaintiffs or anyone else could convince the Court of the necessity of additional assistant principals either to ensure the effectiveness of the magnets as desegregative tools or to enhance the quality of education. The School Board has its work cut out for it as things stand if this plan is to be financed. The Court is convinced that more money needs to reach the classrooms rather than increase the ranks of school administrators, special assistants, coordinators, etc.
The Court also defers to the School Board on the issue of training for magnet school staff members.

G. Enrollment Guidelines
Plaintiffs argue that enrollment process guidelines for the magnet programs are inadequate or non-existent and that the School Board must develop enrollment procedures for the magnet programs and racial controls for sending schools.
Because of the voluntary nature of the magnet and M to M programs, and because these programs must succeed in order to desegregate the public schools, attendance and enrollment guidelines and procedures are essential to the effectiveness of these programs.[26]
*1404 The School Board is ordered to develop comprehensive, effective and equitable attendance and enrollment guidelines, procedures and controls, and shall file with the Court and serve on the other parties a report detailing these by October 1, 1988.

H. Mandatory Back-up Plan
Plaintiffs and the Justice Department argue that the School Board's plan is constitutionally deficient because it lacks a mandatory back-up plan. Plaintiffs' alternative plan proposes that if, after a serious three-year attempt, a magnet school fails to reach seventy-five percent of the projected enrollment of both black and white students, then the magnet program should be discontinued and the former magnet school then paired with another school. The Justice Department proposes no specific mandatory back-up plan but argues that something mandatory should be in place in case the voluntary techniques fail to desegregate completely the public schools.
Taking plaintiffs' proposed back-up as an example, there become apparent a number of reasons why such a mandatory plan would be inappropriate and unnecessary under the circumstances. To have such an alternative in place would send a negative signal to parents: that the Court and the School Board lack confidence in the viability of the School Board's plan; that the very thing the Board's plan is designed to avoid and to which parents are opposed  mandatory reassignment and busing  is inevitable should the Board's plan fail in any respect; and that, therefore, under such circumstances a magnet or M to M transfer or a return from a private school involves a risk of forced busing. Such a mandatory back-up plan could easily become a self-fulfilling prophecy.
More central to the Court's objections to such a back-up plan is that it fails to take into account the particular problems and circumstances that might exist in three years at a particular school; moreover, it fails to recognize that some other measure may be more appropriate and more effective under circumstances which no one can today foresee. This Court refuses to recognize the validity of a "one size fits all," knee-jerk remedy under the circumstances of this case. Furthermore, the Court refuses to rely automatically on a particular remedy as a back-up when that remedy was probably responsible in large measure for the dilemma in which the school system finds itself today. Creativity and flexibility will be essential if some part of the School Board's plan fails.[27]
The last magnet program is not scheduled to be in place until the 1991-92 school year, and the parties are agreed and the Court recognizes that a magnet deserves at least three years to develop and to prove itself viable. The Justice Department argues that a mandatory back-up plan is even more essential here because the School Board's plan will not be proven effective until 1994 at the earliest and that further delay while the parties argue over a backup plan would be unconscionable.
The Court has two observations related to that point. First, the relative success of many other essential elements of the School Board's plan will be apparent long before 1994. Second, the Justice Department overestimates the patience of this Court. It was this Court that refused the entreaties of all parties for further delay this past Spring and that insisted on a plan being in place in time for the coming school year. This Court will monitor the progress of the School Board's endeavor, and it will not hesitate to act swiftly to ensure that *1405 the School Board achieves the desegregation of the public schools as soon as possible. Considering the continuing involvement of this Court and the impossibility of predicting the precise nature of any problems which might arise, any mandatory back-up plan would be superfluous at this time.

I. Finances
The School Board indicated that it will have sufficient funds available to support the proper implementation of its desegregation plan. The Court understands the inherent difficulty with financial projections; still, the Court is satisfied that the funding will be available to ensure the success of the School Board's desegregation plan.
The Court emphasizes that, by establishing the link between educational enhancement and effective desegregation, the School Board has earned the opportunity to achieve the desegregation of the public schools through an ambitious and expensive plan. Because the School Board has urged and the Court is persuaded that such a plan is the only practicable method of desegregating the public schools, the Court is not likely to accept any excuses related to lack of funding. In approving this plan, the Court orders the School Board to implement this remedy and to provide adequate financing for its success. The School Board cannot urge the Court to approve a desegregation plan and then avoid implementing that plan because of a lack of funding.
None of the parties has requested the Court to order a tax increase, and the Court is not prepared to do so at this time. See Liddell v. State of Missouri, 731 F.2d 1294, 1320 (8th Cir.) (district court's broad equitable powers to remedy the evils of desegregation include a narrowly defined power to order increase in local tax levies on real estate, after exploration of every other fiscal alternative), cert. denied, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984). The parties should be aware that no state limitation on the power to levy taxes can by itself prevent the implementation of a desegregation plan ordered by this Court. See also Griffin v. School Bd. of Prince Edward County, 377 U.S. 218, 233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964).

V.
The Court approves defendant School Board's proposed desegregation plan as reflected in Defendant's Exhibit 2A, 2B, 5, 6 and 7, and orders the School Board to implement its plan without delay.

Reporting
1. The School Board shall file with the Court and serve on the other parties comprehensive, detailed descriptions of all magnet program curricula scheduled to be implemented for the 1988-89 school year no later than October 1, 1988. Further, the School Board shall file with this Court and serve on the other parties similar such descriptions for all other magnet program curricula by March 1, 1989.
2. The School Board shall file with the Court and serve on the other parties its detailed, comprehensive enrollment guidelines, and controls for magnet and M to M transfers by October 1, 1988.
3. The School Board shall file with the Court and serve on the other parties by October 1 and March 1 of every school year, until such time as the school district is released from the jurisdiction of this Court, reports containing at least the following information:
(a) The total student enrollment of the district by race for the current school year;
(b) The total student enrollment of each school by race for the current year;
(c) The total number of students by race participating on a full-time basis in magnet schools and programs, with an accounting of each student's sending and receiving school during the current school year;
(d) The total number of resident students by race participating on a limited basis in magnet schools and programs during the current school year;
(e) The total number of students by race participating in the majority to minority transfer program, with an accounting of *1406 each student's sending and receiving school during the current school year;
(f) The total number of private school returns by race, with an accounting of each such student's receiving school during the current school year;
(g) A description of all new construction, as well as a description of all renovations, modifications or additions to existing facilities proposed to be undertaken and which has not previously been supplied. The School Board will provide all plans, specifications, costs and site locations as soon as available.
(h) A current and accurate description of any and all magnet-type programs in operation during the current school year, by school;
(i) An evaluation by the School Board of the effectiveness of its desegregation measures. In making this evaluation, the School Board should attempt to comment on various factors, including the amount of funding committed to the magnet schools and programs, the extent to which magnet schools and programs have been implemented at racially imbalanced schools, the recruitment efforts undertaken by the school system to attract students to utilize various desegregation measures, and the convenience of transportation for students interested in participating in transfers.
(j) The total number and the number by school of all existing faculty, all new hires and all retirees, such information to be provided by race, and the same information for administrative personnel;
(k) Upon the completion of preregistration for magnet programs in the spring of each school year and as the information becomes available during the summer, the School Board shall serve the parties with projected racial enrollments for each magnet program then in effect.
4. If, after two years of operation under the plan and after the completion of preregistration for the third school year, it appears that a school will not meet the plus or minus twenty percent goal, the School Board shall file with the Court and serve on the other parties, by November 1 of the third school year, a report to specify:
(a) the reason(s) why such school has not met the enrollment projections as set forth in the Plan;
(b) the reason(s), if any, why it believes more time should be permitted to achieve the goals; and/or
(c) alternative desegregation mechanisms designed to bring the school within the plus or minus twenty percent standard; and/or
(d) the reason the Board believes that the maximum practicable degree of actual desegregation has been obtained, or why the desegregation measures employed at the school are otherwise constitutionally and legally sufficient, although such school has not attained the plus or minus twenty percent goal.
The Court retains jurisdiction over this case.

VI.
The Court has been persuaded of the validity of the School Board's position that voluntary techniques will lead to effective and stable desegregation if given an opportunity to succeed. The Court encourages this use of voluntary movement by students to desegregate the public schools. The Court understands the importance of choice in relation to education. The School Board's plan takes into consideration that "[a] child's enrollment in a particular school is the result of two decisions: the government's student assignment, and the parents' decision to stay, move or send their children to private school." Liddell v. State of Missouri, 731 F.2d 1294, 1314 (8th Cir.1984).
The purpose of an educational system is to educate, to equip children to meet the demands of life in our ever more complex world, and to prepare children for the responsibilities of citizenship in a democracy. The job market is exacting. Nationally, our educational system rates poorly in almost every objective assessment compared to Western Europe and Japan. It is no secret that we are faring even more poorly *1407 in economic competition with these same countries. As the Dean of the Business School at Emory University recently remarked:
Sixty years ago President Calvin Coolidge said that the chief business of the American people is business. Now it seems possible that, unless our chief business becomes education, there may not be any business.
Robson, Chief Business of the U.S. Needs to be Education, Atlanta Constitution, May 20, 1988, at 1-B, col. 1.
Our public school system is important to all who live in this community; furthermore, it is as important to non-public school students and their parents as it is to public school students and their parents. Many of this community's problems are related to our failure to make a quality desegregated education for every student a priority. The Court emphasizes, however, that an acceptable unitary system is its objective. Once that goal is met, the Court will return to the board and citizenry the total operation of the schools. The School Board's desegregation plan which the Court today approves establishes ambitious yet realistic goals for the school system to achieve over the next few years in order to desegregate the public schools. It is no accident that the plan will enhance the quality of education in this community.
Certain things are impossible to accomplish by judicial decree. Excellence in the public schools, for example, requires a commitment from the people. So, too, with desegregation under the School Board's plan. If the School Board's projections for a largely voluntary path to desegregation are to come to pass, parents and students must be willing to try out different schools and new programs in a desegregated environment. Whether student assignments are ultimately achieved through voluntary or mandatory techniques, the degree of success in desegregating the public school system will mirror the force of this community's commitment to improving the quality of education in its public schools.
The Court therefore orders the above remedial relief.
IT IS SO ORDERED.
NOTES
[1] For a taste of early proceedings in this matter, see Stell v. Savannah-Chatham County Board of Education, 220 F.Supp. 667 (S.D.Ga.1963), rev'd, 333 F.2d 55 (5th Cir.1964), cert. denied sub nom. Roberts v. Stell, 379 U.S. 933, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964), on remand, Stell v. Savannah-Chatham County Board of Education, 255 F.Supp. 88 (1966).
[2] Indeed, it is hard to imagine a more sweeping and comprehensive busing plan for desegregation. In 1971 Judge Lawrence commented that, with the exception of one school, the School Board had achieved what appeared to be a unitary system in a matter of several months. Stell v. Savannah-Chatham County Board of Education, 334 F.Supp. 909, 912 (S.D.Ga.1971). Of course, the school system has not yet achieved unitary status.
[3] The final tally of the February 2, 1988 referendum on the bond issue was 13,659 in favor and 27,444 opposed. The Court recognizes that the funding appeared to serve two particular purposes: 1) to finance an effective desegregation plan, and 2) to improve dramatically the quality of public education in Chatham County. As the Court emphasizes in this Order, the two goals, desegregation and educational quality, are not mutually exclusive.
[4] The Court had hoped that the Justice Department would propose an alternative plan of its own. Except for a passing mention of an alternative approach in its closing argument at the April 25-27 hearings, the Justice Department did not propose any alternative desegregation plan.
[5] There appears to be little controversy among the parties regarding the necessity for any further desegregative efforts with respect to the high and middle schools.
[6] Two of the magnet programs, at Hodge and Gadsden elementary schools, were previously approved as part of the former long range plan and have been in operation the past year. Four additional elementary magnet programs will be implemented in 1988-89, and the two remaining elementary magnet programs will be implemented between 1990 and 1992.
[7] For example, under the Board's plan, of the 508 students enrolled at Hodge Elementary School, only 300 students would be enrolled in the computer science magnet program (150 black and 150 white students) while the remaining students, predominantly black, would be enrolled in a regular program.
[8] Neither plaintiffs nor the Justice Department introduced any evidence against or otherwise objected to the proposed closing of these schools. The closing of Tybee Elementary School is clearly within the discretion of the School Board. There is no basis for the Court to interfere with that decision.
[9] Plaintiffs' back-up plan does not appear to take into account the possible failure of efforts to desegregate non-magnet schools.
[10] Although invited by the Court to submit further information regarding its proposal, the Justice Department never did so.
[11] The Court is sympathetic to Dr. Carter's position and recognizes the link between effective desegregation efforts and educational enhancement.
[12] Both Dr. Carter and Dr. Martha Fay, President of the Savannah-Chatham County Board of Education, stressed the Board's preoccupation with the immediate success of the Gadsden and Hodge magnet programs.
[13] Dr. Armor's extensive credentials and experience, along with his various publications on related topics, clearly establish him as an expert in desegregation. The Court found credible his analysis, conclusions and recommendations regarding the Savannah-Chatham County School System.
[14] See Armor, White Flight and the Future of School Desegregation in School Desegregation Past, Present and Future 187 (W. Stephan & J. Feagin eds. 1980); D. Armor, White Flight, Demographic Transition, and the Future of School Desegregation (1978); D. Armor, Sociology and School Busing Policy (1976). Dr. Armor has also testified as an expert witness in over twenty-five desegregation cases, including cases involving Los Angeles, San Diego, Pasadena, Dallas, Atlanta, Omaha, Milwaukee, and Pittsburg.
[15] As to the data available in this case compared to the data available in other cases, Dr. Armor said that the data available here was the best data he had ever seen available to a school board fashioning a desegregation remedy.
[16] The Court accepted Dr. Rossell as an expert in school desegregation and recognizes that she is in the forefront of her field. Aside from her extensive consulting experience, she has received numerous grants to pursue further study of desegregation, and she has published widely and recently on the consequences of school desegregation, strategies for effective desegregation, the problem of white flight, and the value of magnet schools. See Defendant's Exhibit 18. The Court found Dr. Rossell's testimony credible, her breadth of knowledge and understanding regarding desegregation issues impressive, and her conclusions and recommendations as to the Savannah-Chatham County school system persuasive. It is also refreshing to encounter a non-lawyer witness with a command of the details and significance of relevant school desegregation cases which should be the envy of cross-examining counsel.
[17] In response to the Court's question about the essential premises which must underlie an effective desegregation program, Dr. Rossell testified to the following:

The first, I think, principle is that mandatory reassignment plans produce significant white flight. That is, approximately half of the students assigned to schools above 90% black will not show up at that school.
Now, if the school system was completely segregated beforehand, that's an improvement actually, because prior to that there would have been zero whites at those schools.
In the early '70's, I think the only kind of desegregation plans that would have effectively desegregated were those mandatory reassignment plans. One of the things we have learned over time is that parents have choice. That is, they can choose not to put their child in that school that they are mandatorily assigned to. And they do. That is, they leave the school system, not only in the implementation year but over time. And they leave the school system wherever they are mandatorily reassigned out of their schools.
There's also another factor going on here; and that is, they don't enter into school districts which have mandatory reassignment plans. People who move into this area will not move into the Savannah/Chatham County School District because they don't want their child to be mandatorily reassigned. And most people would prefer to put their child in the public schools which their taxes support.
People want choice. I mean, the recent research suggests that both black and white parents are highly supportive of the concept of choice. That act of choosing, as far as they are concerned, is important in terms of enhancing the status of that school. The fact that black children chose to go to this white school out in the suburbs is important to those white parents staying there. The fact that all the children in this magnet program chose to go to that school is important to the parents in terms of their feelings about the quality of education in that school. So that act of choice is very important.
And, the competition amongst schools which happens in a magnet voluntary plan provides all the right incentives to both the consumers and the producers. When schools have to compete against other schools, which they do not have to do in a mandatory reassignment plan, the incentive to the producer is to produce high quality education in order to attract to those students. The incentive to the consumer; that is, the parent, is to demand high quality education in return for their enrollment.
In a study that Charlie Glenn and I did of Cambridge and Buffalo, we found that achievement scores in both of those school systems increased dramatically over the ten years that they had a choice desegregation plan where parents could choose these different schools. And we think it's because of this competition amongst schools, and because it puts parents in a position of having power for the first time.
In the mandatory reassignment plan, both black and white parents are effectively powerless. They have no choice. The school system assigns them, and they have to go where they are assigned to unless they have the resources to choose private schools. But the parents who are left behind don't have a choice.
So, a voluntary magnet school plan offers choice to parents who would ordinarily be powerless; that is, the poorer parents. And, it attracts back into the school system white and non-white middle class parents who feel that being able to make a choice means that the quality of education in that school system is better. And ultimately, it becomes a self-fulfilling prophecy. By making a choice, by making those demands, by putting resources into these black schools, the quality of education does become better.
[18] Dr. Stolee has been involved in planning desegregation remedies in various cities across the nation and has testified in a number of desegregation cases. Dr. Stolee had some involvement with the development of the 1970-71 Savannah-Chatham County desegregation plan. Dr. Stolee explained that he had not published much relating to desegregation in the last years because he has tenure and was therefore not obligated to contribute to the published research and literature of his profession. His writing in his field during the last dozen years has been almost exclusively limited to reports to various courts across the country in desegregation cases.
[19] Dr. Stolee also testified that the magnet program concept was problematic for several other reasons. He said that experience indicated that relationships between magnet and non-magnet teachers is difficult to achieve, that non-magnet students may resent the magnet students, and that conflict may develop between magnet and non-magnet parents. While the School Board needs to monitor the magnet programs for these potential problems, the testimony of the two magnet school principals and that of Dr. Carter indicated that there were no significant problems in these areas to date.
[20] Dr. Stolee testified that in his experience there were very few racists and that therefore a 50-50 percent ratio of black to white students in magnet programs was not necessary. Dr. Stolee testified that he believed parents were willing to put their children on buses as long as the children will be attending good schools. Dr. Stolee opined that reassignment and busing were not terribly disruptive to a child's education, since children move all the time and people think such moves are disruptive only in desegregation cases. Dr. Stolee did not address the negative impact that mandatory busing has on a school system, nor did he address the issue of white flight.
[21] Although the Court recognizes that some of Dr. Stolee's recommendations are intended to remedy apparent weaknesses in the School Board's plan, these weaknesses do not undermine the heart of defendant's plan. The Board may choose to address these weaknesses as it implements its plan.
[22] Inconsistencies in Dr. Stolee's testimony served to undercut the validity of all that he said. Perhaps the problem of expert witnesses has been best summarized by Herman Melville:

Who in the rainbow can draw the line where the violet tint ends and the orange tint begins? Distinctly we see the difference of the colors, but where exactly does the one first blendingly enter into the other? So with sanity and insanity. In pronounced cases there is no question about them. But in some supposed cases, in various degrees supposedly less pronounced, to draw the exact line of demarcation few will undertake, though for a fee becoming considerate some professional experts will. There is nothing namable but that some men will, or undertake to, do it for pay.
Excerpted from Billy Budd, Sailor, Chpt. 21 (Hayford & Scalts Eds.1962). Dr. Stolee's testimony appeared not only inconsistent at times, but also based on premises which had not evolved sufficiently in the past fifteen years. The Court found his testimony regarding his proposed plan and the School Board's plan unconvincing.
[23] Certainly neither the plans proposed by the other parties nor any plan devised by the Court shows any promise of working more effectively. The long range plan defeated by the bond issue was clearly a more desirable plan. The Court has not been asked nor is it convinced it is absolutely necessary at this time to order a dramatic increase in expenditures which a plan like the School Board's long range plan would require. Naturally, the Court hopes and expects that such exercise of its authority will never be required.
[24] The Court also recognizes that one is more likely to implement effectively a plan of one's own design and choosing.
[25] It is important to note that not a single resident black student was denied admittance to the magnet program at either Gadsden or Hodge, except for students who applied after the application deadline.
[26] The Court in Diaz v. San Jose Unified School District noted the following:

A requirement that all students explicitly choose their preferred schools is an important component of a desegregation plan that seeks to encourage students to enroll voluntarily in schools other than those in their neighborhood attendance area. The requirement that each student make such a choice means ... that parents and students will give genuine consideration to which schools are most suited to their interests and whether their neighborhood school is necessarily the best selection ... without such explicit choice, it is likely that students would continue to attend their neighborhood schools without adequate consideration of the alternatives.
633 F.Supp. 808, 816 (N.D.Cal.1985). In formulating enrollment procedures, the School Board shall take into consideration the wisdom of this passage from Diaz.
[27] For example, the Court is not convinced that the School Board's plan to desegregate May Howard and Pooler Elementary Schools is entirely realistic. The School Board has offered to place magnet programs in those schools. The Court is persuaded that black students may be enticed to these schools but questions whether white students can be enticed from these schools. These schools will need to be monitored closely, like others in the system, and alternative desegregation techniques implemented as necessary.